**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

MICHAEL A. HELLMAN )
)
)
)
Plaintiff, )
)
) Civil Action No: 05-1293
)
v. ) CHIEF JUDGE AMBROSE
)
JO ANNE B. BARNHART, )
Commissioner of Social )
Security, )
)
)
Defendant. )

**MEMORANDUM AND ORDER**

**MEMORANDUM**

Acting pursuant to 42 U.S.C. § 405(g), Michael A. Hellman
("Hellman" or "the claimant") appeals from a July 21, 2005 final
decision of the Commissioner of Social Security ("the
Commissioner") denying his application for disability insurance
benefits under title II of the Social Security Act, 42 U.S. C.
§§ 401-403 ("the Act"). Cross-motions for summary judgment are
pending.

**I. Procedural Background**

Hellman applied for disability insurance benefits on August
12, 2003, alleging that he had been disabled since May 27, 2003
due to HIV-related fatigue and neuropathy, and irritable bowel
syndrome. (R. 50 ) Following initial denial of his application,
Hellman requested an administrative hearing that was held on
March 14, 2005 before an Administrative Law Judge ("ALJ") in
Pittsburgh, PA. Hellman, who was represented by counsel, and a

vocational expert testified. (R. 283). In a decision dated May 4, 2005, the ALJ concluded that although Hellman suffered from a severe impairment, HIV, this condition did not meet or medically equal a listed impairment. (R. 10). The ALJ also concluded that Hellman retained the residual functional capacity to perform light work, and could, therefore, return to his past relevant work. As a result, Hellman's request for benefits was denied. Hellman filed a request for review of the ALJ's decision.(R. 6). In an opinion dated July 21, 2005, the Appeals Council affirmed the decision of the ALJ, making that decision the final decision of the Commissioner.(R. 3). This timely appeal followed.

## II. **Factual Background**

### A. **Hellman's Testimony**

At the time of the hearing, Hellman, a 48 year old college graduate, had been HIV positive since 1985. Hellman's prior work included a position as a bank program manager, a job he held from February 2001 until the alleged onset of his disability. This work was essentially sedentary, and required little lifting. (R. 293-94). Prior to that, he worked as a training specialist, a position that was more taxing due to the travel involved.

Hellman testified that the primary factors underlying his inability to work were HIV-related fatigue and neuropathy in his legs. (R. 296). He stated that the neuropathy caused pain in his legs, preventing him from sitting or standing "for any length of time because I have to keep them stretching." (R. 297). His ability to sit was limited to about two hours, his walking to ten or fifteen minutes, and standing to five or ten minutes. He

-2-

reported taking Neurontin to help with the pain, and stated that morning stretching was somewhat helpful.

Hellman also testified that he suffered from irritable bowel syndrome that had responded to diet. Bowel accidents that had been a problem at work continued, although his need to visit the bathroom had decreased to about three times per day.(R. 302). He also reported feeling depressed, especially when he had to transition away from working. (R. 204). Since the time of that transition, Hellman had not seen a mental health professional, but did take Wellbutrin prescribed by his primary care physician, Dr. Veldcamp. (R. 235).

According to Hellman, he did not suffer from other symptoms of HIV. He stated that he was able to care for his personal needs, walk his dog "up the block and back", do laundry on some days, and cook (R. 306). He could drive about three times per week to the grocery store, to the doctor, or to visit friends in the hospital. (R. 292). He was able to negotiate public transportation, and could ride around the block on a bike. (R. 305). He volunteered two hours a week at the Shepherd Wellness Community answering the phone, (R. 307), and enjoyed flea markets or estate sales. (R. 307-308). He occasionally attended church or a movie.(R. 308). Activity, however, caused him fatigue, and he often napped in the afternoon. (R. 312).

Hellman testified that he did not believe that he was able to return to work even with an option to alternate sitting and standing: "I think the fatigue for one thing would really get to me." (R. 309). Although he worked for twenty years following his HIV diagnosis, he stated that the fatigue and the irritable bowel

-3-

syndrom eventually became too much for him. (R. 310).

## B. **Medical Records**

Medical documentation of Hellman's health history dates from March 2002 when Hellman was seen by his primary care physician, Dr. Roger Anderson. Hellman complained of neck and back pain, "depression and anxiety, erectile dysfunction, neuropathy, wasting syndrome, liposdystrophy, insomnia, carpal tunnel syndrome in both wrists, and chronic sinusitis." (R. 141). Dr. Anderson prescribed Flexaril, Paxil, and Ambien, ordered an MRI, and referred Hellman for evaluation of carpal tunnel disease. (R. 142). At Hellman's June and August visits with Dr. Anderson, he complained of psoriasis and diarrhea, and was placed on a revised HIV-related drug regimen.(R. 138, 139-140).

When he saw Dr. Anderson in October 2002 and February 2003, Hellman complained of increased fatigue. (R. 135,136). In May 2003, Dr. Anderson noted Hellman's complaints of explosive diarrhea, abdominal pain, intermittent chest pain, and fatigue. (R. 134). Three months later, Dr. Anderson wrote that Hellman needed to have long-term disability papers completed. (R. 132). Hellman's diarrhea had improved with treatment, as had his depression and anxiety. Hellman continued to complain of fatigue. Later in August 2003, Dr. Anderson wrote that Hellman was experiencing diarrhea two or three times per day, and continued to suffer lower back pain and fatigue. The doctor also noted fatty deposits in his upper back and neck, stating that Hellman's mobility was limited. (R.131). During the same month, Dr. Anderson completed insurance forms provided by Hellman's employer. (R. 126). He wrote that Hellman suffered from "advanced

AIDS" with a poor prognosis for recovery. He showed marked limitation in his ability to deal with stress, had difficulty with ambulation and continence, and was "unable to be gainfully employed." (R. 127).

In October 2003, Hellman was evaluated for purposes of his disability claim by Dr. Louis E. Leff, who noted an absence of AIDS-defining illness and described Hellman's overall HIV status fairly stable. (R. 168). Hellman complained of increasing neuropathic pain in his legs, and was observed to be using a cane. Dr. Leff thought that this increase in pain could be due to Hellman's drug regimen. Irritable bowel syndrome continued to trouble Hellman. An endoscopy and colonoscopy conducted by Dr. Joseph Pusateri in July 2003 did not reveal more serious gastrointestinal conditions. (R.106). Cardiac tests ordered by Dr. Ricci Minella were normal. (R. 173).

Raymond Dalton, Ph.D., a state agency psychologist, saw Hellman in November 2003. He reported that Hellman did not suffer from any mental impairment or affective disorder beyond "depressed mood", and was not functionally limited in any way. (R. 181-84). In the same month, disability examiner, J. Bell, concluded that Hoffman retained the functional capacity to return to his past relevant work as a project manager. (R. 35). Bell noted that his opinion was contrary to that of Dr. Anderson, but pointed out that Dr. Anderson's conclusions conflicted with other medical evidence in the record. (R. 32).

On January 27, 2004, Hellman consulted Dr. Peter Veldkamp, a specialist in the HIV-AIDS Unit of Falk Clinic at the University of Pittsburgh. At that visit, Hellman rated his pain level at two

on a scale of ten. Dr. Veldcamp noted that the neuropathy had improved with Neurontin, and weakness was confined to Hellman's calves. The gastrointestinal symptoms had improved, and the symptoms of depression were stable. He continued to do volunteer work and was investigating a tai chi class.[1]

Dr. Veldkamp next saw Hellman in July 2004. Hellman rated the pain in his legs at three. "The pain [had] decreased to a point where he [was] willing to do exercise," and was "able to function."(R. 242). The doctor recommended that Hellman bike to increase his activity and energy level. His mood was "appropriate" and he was "very excited about the fact that he recently bought a new house." In October 2004, Hellman reported an increase in fatigue, but described his pain as "tolerable" and his diarrhea episodes as limited to one or two per day. (R. 237). In January 2005, Dr. Veldkamp reported that the claimant was "doing well" with the exception of pain in his jaw consistent with a history of bruxism. The doctor encouraged Hellman to exercise. (R. 234).

Dr. Pusateri examined Hellman in February 2005. He, too, concluded that Hellman was "doing well", and that his diarrhea was helped by Citracal. His T cell count and viral load were "okay." (R. 255).

## C. **Testimony of the Vocational Expert**

Responding to hypothetical questions posed by the ALJ, the

---

[1]The record of this visit reflects that Hellman's primary care physician was still Dr. Anderson. Hellman expressed a desire to make Dr. Veldkamp his regular doctor as long as this did not jeopardize his disability claim. (R. 249).

-6-

vocational expert testified that an individual with Hellman's background and limitations could perform any of the jobs included in his past relevant work. (R. 314-318).

## D. **The ALJ's Opinion**

In an opinion dated May 4, 2005, the ALJ found that although Hellman did not suffer from a mental impairment, his positive HIV status was a severe physical impairment for purposes of 20 C.F.R. § 404.1520(c)(R.10).).[2] According to the ALJ, this impairment limited Hellman to light work. Because the exertional demands of Hellman's prior jobs did not exceed those required for light work, the ALJ concluded that Hellman was able to return to his past relevant work as a training specialist or project manager. (R. 14). In support of this conclusion, the ALJ referred to lab tests conducted at the Falk Clinic and to medical evidence generated by Drs. Leff, Pusateri, Minella, and Dalton. (R. 14-15). He also relied on the state agency evaluation conducted in 2003, Hellman's account of his daily activities, his demeanor at the hearing, and, in part, on Hellman's subjective reports of pain and fatigue.

Hellman challenges the denial of benefits arguing that the ALJ's decision is not supported by substantial evidence. Specifically, he contends that the ALJ: 1) failed to discuss or give proper weight to the opinion of his treating physician, Dr. Anderson; and 2) accorded undue weight to Hellman's daily

---

[2]This regulation defines a serious impairment one that "significantly limits [the] physical or mental ability to do basic work activities."

activities. The second prong of Hellman's argument lacks merit.[3]
Accordingly, the court confines its discussion to the ALJ's
failure to address Dr. Anderson's findings.

### III. **Standard of Review**

Judicial review is limited to whether the Commissioner's
findings of fact are supported by substantial evidence, Brown v.
Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988), and whether the
correct law was applied. Coria v. Heckler, 750 F.2d 245, 247 (3d
Cir 1984).

### IV. **Discussion**

The court has reviewed the opinion of the ALJ against the
background of the record and is convinced that the ALJ's analysis
is flawed. Although the summary of the medical evidence
underlying the denial of benefits is accurate, it is incomplete.
The ALJ explicitly limited his discussion of the medical evidence
to evidence "consistent with the finding that Mr. Hellman could
still perform the demands of light work . . . ." (R. 14).  Not
once does the ALJ refer to medical records maintained by
Hellman's treating physician, Dr. Anderson, or to the fact that
Dr. Anderson concluded that Hellman suffered from "advanced AIDS"
was completely disabled.

It is well established - and has been for years - that an
ALJ is not free to reject the opinion of a treating physician
without weighing that opinion against other evidence in the

---

[3]The record establishes that Hellman engaged in a wide range of
activities on a regular basis. The circumstances of this case are far
removed from those that prompted the Court of Appeals for the Third
Circuit to write, "Disability does not mean that a claimant must
vegetate in a dark room excluded from all forms of human and social
activity." Smith v. Califano, 637 F.2d 968, 971 (3d Cir. 1981).

record. See Adorno v. Shalala, 40 F.3d 33, 47-48 (3d Cir. 1994).
Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir. 1987); Raymer v.
Massanari, No. Civ. A. 97-5762, 2001 WL 1526265 at *5 ( E.D. Pa.
Nov. 28, 2001). The Court of Appeals has "reaffirmed on a number
of occasions the principle that where a report of a treating
physician conflicts with that of a consulting physician, the ALJ
must explain on the record the reason for rejecting the opinion
of the treating physician." Allen v. Bowen, 881 F.2d 31, 41 (3d
Cir. 1989)(emphasis added). Ignoring altogether the opinion of a
treating physician undermines the claimant's confidence in and
understanding of the decision-making process. Regulations are in
place to ensure that this does not happen. 20 C.F.R. Section
404.1527(d)(2) provides in pertinent part: " We will always give good
reasons in our notice of determination or decision for the weight we
give your treating source's opinion."

The Commissioner's argument that Dr. Anderson's reports may
be excluded from consideration because Hellman transferred his
care to Dr. Veldcamp in December 2003 lacks merit. Hellman
alleges that he became disabled in May 2003. Dr. Anderson was
Hellman's primary care physician at that time and for some months
afterward. His notes were included in the record. Even if the ALJ
did not find Dr. Anderson's opinion persuasive, the law requires
that he explain why. Incredibly, the ALJ's opinion also fails to
mention treating physician, Dr. Veldkamp, or his reports. This,
too, was error.

The Commissioner argues next that it was proper for the ALJ
to ignore Dr. Anderson's opinion because it conflicted with the
remainder of the medical evidence. This contention, too, lacks

merit. The law mandates that the ALJ explicitly identify and resolve conflicting medical opinion.

### V. **Conclusion**

Because the ALJ failed to address the opinions of Hellman's treating physicians, the court will deny the parties' Motions for Summary Judgment, and remand this matter to the Commissioner with instructions that the ALJ evaluate those opinions in light of other medical evidence of record.

### **ORDER**

AND NOW, this 22nd day of September, 2006, upon consideration of the parties' Motions for Summary Judgment and careful review of the record, **IT IS HEREBY ORDERED THAT:**

1. The parties' Motions for Summary Judgment, (Docs. 12 and 14), are **DENIED;**

2. This matter is **REMANDED** to the Commissioner with for further consideration by the ALJ consistent with this opinion.

Donetta W. Ambrose
U.S. District Judge

cc:
Magistrate Judge Francis X. Caiazza
Counsel of Record

Via electronic mail